**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **BELINDA GARRETT JACKSON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:07CV39 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Belinda Garrett Jackson for Disability Insurance Benefits under Title II

of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This

case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil

Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff

has filed a Brief in Support of the Complaint. (Document Number 18). Defendant has filed a

Brief in Support of the Answer. (Doc. No. 24).

**Procedural History**

On March 27, 2003, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition in July 2000. (Tr. 69-73, 644-47). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated August 19, 2004. (Tr. 22, 38-42, 649,

18F-18M). Plaintiff then filed a request for review of the ALJ's decision with the Appeals

Council of the Social Security Administration (SSA), which was denied on January 31, 2007. (Tr. 18A, 8-11). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on July 12, 2004. (Tr. 656). Plaintiff was present and was represented by Daren Ford, Representative. (Id.). Also present was vocational expert Randi Lansford Hetrick. (Id.). The ALJ began by admitting the exhibits into the record. (Id.).

Plaintiff's representative then examined plaintiff, who testified that she was 43 years of age and lives alone. (Tr. 657-58). Plaintiff stated that she did not have any children under the age of eighteen. (Tr. 658). Plaintiff testified that she was five-feet-six-inches tall and weighed 184 pounds. (Id.). Plaintiff stated that she did not smoke or consume alcohol. (Id.). Plaintiff testified that she had never been rehabilitated for substance abuse or been found guilty of a felony. (Id.).

Plaintiff stated that she graduated from high school and completed one year of business college. (Id.). Plaintiff testified that she last worked in July of 2000. (Tr. 659). Plaintiff stated that she was working as a day care provider when she stopped working. (Id.). Plaintiff testified that she stopped working because working made her nervous. (Id.). Plaintiff stated that she has also worked at a restaurant and at Bud's Warehouse as a department manager. (Id.).

Plaintiff testified that she is unable to work due to social phobia, anxiety attacks, depression, and back problems. (Id.). Plaintiff stated that Dr. Khursheed Zia is her treating

psychiatrist. (Id.). Plaintiff testified that Dr. Zia's office is at the Bootheel Clinic in Sikeston, Missouri. (Tr. 660). Plaintiff stated that she has been treating with Dr. Zia for about two years. (Id.). Plaintiff testified that she had not seen a psychiatrist before that time. (Id.). Plaintiff stated that she had been hospitalized four times. (Id.).

Plaintiff testified that she feels depressed and is scared to be around people. (Id.). Plaintiff stated that she occasionally feels better than she did when she quit work in July of 2000 and that she occasionally feels worse. (Id.).

Plaintiff testified that Dr. Glenn Brown treats her for her back pain. (Id.). Plaintiff stated that she underwent back surgery in 1991. (Tr. 661). Plaintiff testified that she still experiences lower back pain. (Id.). Plaintiff stated that she has problems mopping her floor and standing for long periods. (Id.). Plaintiff testified that she experiences pain across her lower back and down into her legs if she stands too long. (Id.).

Plaintiff stated that her primary problem keeping her from working is her social phobia. (Id.). Plaintiff explained that she is scared of being around people and she does not like to leave her home. (Id.).

Plaintiff testified that she has a driver's license and that she drives to her friend's house in Scott City. (Id.). Plaintiff stated that her friend lives about ten blocks from her home. (Id.). Plaintiff testified that she does not typically leave Scott City by herself. (Id.). Plaintiff stated that she usually picks up her friend Shannon during the week and goes to the store. (Id.). Plaintiff testified that she does not leave town by herself because she has attacks and becomes scared. (Tr. 662).

Plaintiff stated that her support worker, Lyn Fortner, takes her to Bootheel Counseling.

(Id.).  Plaintiff testified that Ms. Fortner has been coming to her home since she moved to Scott City eighteen months prior to the hearing.  (Id.).  Plaintiff stated that she sees Dr. Zia once a month.  (Id.).  Plaintiff testified that she sees Ms. Fortner once a week for home visits.  (Id.).

Plaintiff stated that she was last hospitalized around March of 2004 at Southeast Hospital in Cape Girardeau, Missouri.  (Id.).  Plaintiff testified that she was hospitalized at Southeast Missouri Mental Health Center in Farmington, Missouri, in 2003.  (Tr. 663).  Plaintiff stated that she was also hospitalized at Southeast Hospital on a few more occasions prior to this time.  (Id.).  Plaintiff testified that she is forced to go to the hospital when she becomes severely depressed.  (Id.).  Plaintiff stated that she has taken overdoses of her medications on a couple of occasions.  (Id.).

Plaintiff testified that she takes her medications as prescribed.  (Id.).  Plaintiff stated that she has a pill box and she is able to place her pills in the box.  (Id.).

Plaintiff testified that she sees her family.  (Id.).  Plaintiff stated that she sees her brother, who lives with Shannon, almost daily.  (Id.).  Plaintiff testified that she sees her daughters and her granddaughter every week to two weeks, depending on when they make the trip to her house.  (Id.).  Plaintiff stated that she does not arrange the visits with her children.  (Id.).

Plaintiff testified that on a typical morning, she lets out her two dogs, takes her medication, sits and "piddles" for a while, and then naps for two to three hours.  (Tr. 664).  Plaintiff stated that she may also call Shannon and visit with her, after which she takes her medication and takes another nap.  (Id.).  Plaintiff testified that she sleeps a lot.  (Id.).  Plaintiff stated that she sleeps for a while at night, wakes up and writes in her journal, and then goes back to sleep until 10:00 or 11:00 a.m.  (Id.).

Plaintiff testified that she is able to take care of her personal needs, including bathing and cleaning. (Tr. 665). Plaintiff stated that she is able to cook and wash dishes. (Id.). Plaintiff testified that Shannon sweeps and mops her floors because she is unable to do these chores due to her back pain. (Id.).

Plaintiff stated that she receives food stamps and Medicaid benefits. (Id.). Plaintiff testified that she had been receiving Medicaid for two-and-a-half years prior to the hearing. (Id.).

Plaintiff stated that she does not perform yard work. (Id.). Plaintiff testified that her hobbies include reading and watching television occasionally. (Id.). Plaintiff stated that she used to enjoy sewing but can no longer afford this hobby. (Id.). Plaintiff testified that she shops for groceries with Shannon. (Id.).

Plaintiff stated that she left her husband and her home eighteen months prior to the hearing. (Id.). Plaintiff testified that she is still married and that she has been married for four years. (Tr. 666). Plaintiff stated that her limitations have improved in some ways and have worsened in some ways since she left her husband. (Id.).

The ALJ then examined plaintiff, who testified that she goes to Shannon's house and Shannon goes with her to the store. (Tr. 667). Plaintiff stated that she is able to go out in public if someone is with her. (Id.). Plaintiff testified that her social phobia worsened when she left her husband. (Id.).

Plaintiff stated that she has asthma. (Id.).

Plaintiff testified that she underwent back surgery in 1991, which still affects her. (Id.). Plaintiff stated that she is able to lift less than ten pounds on a regular basis. (Id.). Plaintiff testified that she is able to stand for ten minutes before she has to sit. (Id.). Plaintiff stated that

she would not be able to sit one hour in an eight-hour work period.  (Tr. 668).  Plaintiff testified that she would be able to sit an "hour or so" in an eight-hour work period.  (Id.).

Plaintiff stated that she takes pain medication.  (Id.).  Plaintiff testified that she worked after undergoing lower back surgery.  (Tr. 669).  Plaintiff stated that the surgery was successful to some extent.  (Id.).  Plaintiff testified that she received medical treatment for her back for a while after her surgery and she still takes medication for her back.  (Id.).  Plaintiff stated that she was told that she has three bulging discs.  (Id.).

The ALJ then examined the vocational expert, Ms. Hetrick, who appeared via telephone.  (Id.).  Ms. Hetrick testified that she had reviewed plaintiff's file regarding her past relevant work.  (Id.).  Ms. Hetrick stated that plaintiff has worked as a waitress, which is light; a cashier, which is light; a housekeeper, which is light; and a child monitor which is semi-skilled and medium.  (Tr. 671-72).

The ALJ asked Ms. Hetrick to assume a hypothetical claimant of plaintiff's age, education, with plaintiff's past relevant work, and with the following limitations: capable of performing light work with mild pain; can occasionally climb, balance, stoop, kneel, crouch, and crawl; and has mild to moderate mental limitations for understanding and remembering tasks, sustained concentration and persistence, socially interacting with the general public, and adopting to work place changes.  (Tr. 672).  Ms. Hetrick testified that such an individual would be able to perform plaintiff's past work as a housekeeper and a cashier.  (Id.).  Ms. Hetrick stated that the individual would not be able to perform plaintiff's past work if she were restricted to sedentary work.  (Id.).

Ms. Hetrick testified that the individual would not be able to perform any of plaintiff's past

relevant work if she were markedly limited in mental functions. (Tr. 673).

Ms. Hetrick testified that the individual could perform other entry-level, unskilled work if she had mild to moderate mental limitations and the postural limitations discussed in the first hypothetical. (Id.). For example, Ms. Hetrick stated that the individual could work as an office clerk, of which 3,200 jobs exist in Missouri and 100,000 nationally; storage facility clerk, of which 600 jobs exist in Missouri and 128,000 nationally; and escorter, of which 700 exist in Missouri and 87,000 nationally. (Tr. 673-74). Ms. Hetrick testified that the individual would not be able to perform any of these positions if she were markedly limited in mental functions. (Tr. 674).

Plaintiff's representative then asked Ms. Hetrick to assume an individual who has poor sleep, cries a lot, is unable to stay at her brother's house for fifteen minutes, has a depressed mood, and would need to be absent from the work place at least three or more times a month on a sustained basis due to these problems. (Tr. 675-76). Ms. Hetrick testified that such a person would be unemployable. (Tr. 676).

Plaintiff's representative indicated that the medical record was complete. (Tr. 677).

### B. Relevant Medical Records

The record reveals that plaintiff was treated at Southeast Missouri Health Network from September 1996 through October 2002 for various complaints, including chronic musculoskeletal low back pain, headaches, sinus infection, asthma, and depression. (Tr. 203-48). Plaintiff's impairments were treated with medication. (Id.).

Plaintiff saw William B. Bradley, N.P. from June 1999 through February 2003 for various complaints, including abdominal pain, cough, asthma, chest pain, headaches, allergies, back pain,

and depression.  (Tr. 250-77).

Plaintiff saw Robert F. Sacha, D.O. on September 12, 2000, for treatment of allergies and asthma.  (Tr. 354).  Dr. Sacha noted that plaintiff had presented to the emergency room five months prior due to an asthma attack.  (Id.).  Dr. Sacha's impression was asthma, moderate in nature and migraine headaches.  (Tr. 355).

Plaintiff saw R.A. Ritter, Jr., M.D. on October 12, 2000, for a Vocational Rehab Evaluation.  (Tr. 358).  Plaintiff complained of discomfort in her back and posterior legs and intermittent numbness in her feet.  (Id.).  Dr. Ritter noted that plaintiff had undergone disc surgery in 1991.  (Id.).  Dr. Ritter stated that plaintiff had sustained an injury to her upper back in 1994 and had recovered from that.  (Id.).  Dr. Ritter found that plaintiff has continued symptoms of back pain following previous lumbar[1] disc surgery, with no signs of acute nerve root compression.  (Id.).  Dr. Ritter stated that plaintiff may have some scarring and mild stenosis as the cause of her numbness that she gets with any prolonged standing.  (Id.).  Dr. Ritter found that plaintiff would be a good candidate for vocational training that did not involve any sort of repeated bending or lifting activities that require lifting more than 20 pounds.  (Id.).

Plaintiff presented to the emergency room at Missouri Delta Medical Center on May 14, 2001, with complaints of back pain after her dog jumped on her.  (Tr. 323).  X-rays revealed compression of L1.  (Tr. 324).

---

[1]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

Plaintiff saw Lori A. Moyers, D.O. on October 17, 2001, for an examination at the request of the state agency. (Tr. 361-66). Plaintiff complained of asthma; back, leg, and feet pain; high cholesterol; and depression. (Tr. 361). Plaintiff reported frequent nervous spells, crying spells, and difficulty sleeping at night. (Tr. 364). Dr. Moyers' impression was mild asthma; status post lumbar disc surgery; status post hysterectomy and estrogen deficiency; high cholesterol; migraine headaches; and depression. (Tr. 365). Plaintiff exhibited decreased range of motion and flexion extension of her back with no radicular signs. (Tr. 366). Plaintiff had full strength in all four extremities with questionable effort. (Id.). Plaintiff's sensation was intact. (Id.). Plaintiff had no neurological abnormalities. (Id.). Dr. Moyers noted that plaintiff appeared depressed, had an unkempt appearance and a flat affect, although there was no evidence that she was homicidal or suicidal. (Id.). Plaintiff had no abnormalities of thought process and scored a 30 out of 30 on her Mini Mental Status Exam. (Id.).

Marsha J. Toll, Psy.D. completed a Psychiatric Review Technique on October 31, 2001. (Tr. 377-90). Dr. Toll found that plaintiff's depression was non-severe and caused mild restrictions in activities of daily living and mild difficulties in maintaining social functioning. (Tr. 387).

Plaintiff presented to Missouri Delta Medical Center on April 28, 2002, and on May 5, 2002, with complaints of back pain. (Tr. 311-16). Plaintiff underwent x-rays of the lumbar spine on April 28, 2002, which revealed osteoarthritis[2] of the lower lumbar spine with minimal joint

[2]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints. See Stedman's Medical Dictionary, 1388 (28th Ed. 2006).

space narrowing of L5-S1.  (Tr. 317).

Plaintiff presented to Southeast Missouri Hospital on May 6, 2002, with complaints of right hip and back pain with right leg numbness.  (Tr. 419).  Plaintiff underwent a lumbosacral MRI, which was unremarkable other than minimal disc changes with no impingement of any of the nerve roots.  (Tr. 420, 423).  The impression of Douglas A. McIntonsh, M.D. was right back pain with right sciatica.[3]  (Tr. 420).  Plaintiff was discharged in stable condition and was advised to keep her appointment with Bill Bradley, nurse practitioner, for the following day.  (Id.).

Plaintiff presented to Bootheel Counseling Center on June 6, 2002, "in crisis," reporting depression and suicidal thoughts.  (Tr. 429-32).  Samina Khattak, M.D. diagnosed plaintiff with major depressive disorder,[4] recurrent, severe, without psychotic features; and assessed a current GAF[5] of 48,[6] with 60[7] as the highest GAF and 48 as the lowest GAF in the past year.  (Tr. 431).  Dr. Khattak recommended that plaintiff be enrolled into the Comprehensive Psychiatric

---

[3]Pain in the lower back and hip radiating down the back of the thigh into the leg.  See Stedman's at 1731.

[4]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  See Stedman's at 515.

[5]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[6]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

[7]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 32.

Rehabilitation Program. (Tr. 432). Dr. Khattak noted that plaintiff stated that she wanted to decrease her depression, find a job, and increase socialization. (Id.). Dr. Khattak found that plaintiff could benefit from community support in order to increase her emotional stability and decrease her symptoms of depression. (Id.).

Plaintiff saw Karen E. Lee, Psy.D, on July 1, 2002 for a psychological evaluation. (Tr. 443-48). Dr. Lee diagnosed plaintiff with generalized anxiety disorder,[8] panic disorder[9] without agoraphobia,[10] dysthymic disorder,[11] and rule out dependent personality disorder,[12] and assessed a GAF of 60. (Tr. 448). Dr. Lee recommended a medication review by a psychiatrist to help control plaintiff's anxiety, panic attacks, and difficulty sleeping at night. (Id.). Dr. Lee stated that there is some indication that plaintiff has a dependent personality disorder, which would foster her being dependent on others for things she could do herself. (Id.). Dr. Lee found that plaintiff is more cognitively capable of handling responsibilities than she claims and that there were no significant cognitive difficulties present in her examination. (Id.). Dr. Lee stated that plaintiff is able to understand and remember moderately complex to complex instructions during a normal work day; concentrate and persist on simple to moderately complex tasks during a normal

---

[8]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features. See Stedman's at 569.

[9]Recurrent panic attacks that occur unpredictably. See Stedman's at 570.

[10]A mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open. See Stedman's at 40.

[11]A chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. See Stedman's at 569.

[12]An enduring and pervasive pattern in adulthood characterized by submissive and clinging behavior and excessive reliance on others to meet one's emotional, social, or economic needs. See Stedman's at 568.

workday; interact in limited contact situations involving the general public; interact in moderate contact situations involving work supervisors and coworkers; and adapt to a simple demanding environment. (Id.). Dr. Lee found that it is reasonable to expect substantial improvement in plaintiff's condition in the foreseeable future if treatment recommendations are followed. (Id.).

Jean Singer, Ph.D. completed a Mental Residual Functional Capacity Assessment on July 15, 2002. (Tr. 450-52). Dr. Singer expressed the opinion that plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Id.). Ms. Singer also completed a Psychiatric Review Technique, in which she found that plaintiff's dysthymic disorder, panic disorder, and generalized anxiety disorder caused moderate restrictions of plaintiff's activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 464).

Dr. Toll completed a Psychiatric Review Technique on January 7, 2003. (Tr. 476-89). Dr. Toll found that plaintiff's dysthymic disorder, generalized anxiety disorder, and panic disorder caused moderate restrictions in plaintiff's activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 486). Dr. Toll also completed a Mental Residual Functional Capacity Assessment, in which she found that plaintiff was moderately limited in her ability to understand and remember

detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public.  (Tr. 490-91).

Plaintiff saw Lyle A. Clark, M.D. at the Bootheel Counseling Center for a psychiatric evaluation on January 30, 2003.  (Tr. 425-28).  Plaintiff described symptoms consistent with a major depressive episode, manic episode, and social phobia.  (Tr. 425).  Dr. Clark found that plaintiff's symptoms and functioning were consistent with serious impairment in relationships with friends, serious impairment in mood, serious impairment due to anxiety and passive suicidal ideation.  (Tr. 426).  Dr. Clark stated that plaintiff's symptoms are causing her significant distress and are significantly interfering with her functioning.  (Tr. 427).  Dr. Clark diagnosed plaintiff with bipolar disorder I,[13] depressed, moderate; and social phobia; and assessed a GAF of 38.[14] (Id.).  Dr. Clark started plaintiff on Trileptal[15] and continued her on Lexapro.[16]  (Id.).

Plaintiff presented to the emergency department of Southeast Missouri Hospital via ambulance on February 19, 2003, due to a possible drug overdose.  (Tr. 399).  Plaintiff reported that she had taken a handful of medication, in an attempt to sleep and not to actually kill herself. (Id.).  Plaintiff indicated that her daughter felt she had taken an overdose and contacted the

---

[13]An affective disorder characterized by alternating (e.g., mixed, manic, and major depressive) episodes.  See Stedman's at 568.

[14]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).  DSM-IV at 32.

[15]Trileptal is an antiepileptic drug.  See Physician's Desk Reference (PDR), 2326 (57th Ed. 2003).

[16]Lexapro is indicated for the treatment of major depressive disorder.  See PDR at 3532.

ambulance.  (Id.).  Plaintiff was found to be stable and was not suicidal, but was admitted for further evaluation.  (Tr. 400).  William Y. Childs, D.O. noted that plaintiff had a history of bipolar disorder and prior drug overdose with suicidal gesture.  (Tr. 402).  Dr. Childs' impression was accidental sedative-type drug overdose with normal urine drug screen; no evidence of toxicity; and situational depression with underlying bipolar affective disorder.  (Tr. 403).  Dr. Childs found that plaintiff was stable for discharge home and instructed her to follow-up with her outpatient counselor and comply with her medications.  (Id.).

Plaintiff was admitted to the psychiatric department at Southeast Missouri Hospital on April 10, 2003, after expressing suicidal thoughts to Dr. Zia.  (Tr. 395).  Plaintiff indicated that she had been experiencing suicidal thoughts since leaving her husband three months prior and denied the desire to act on those thoughts.  (Id.).  John Thadeus Lake, M.D. found plaintiff to be friendly and cooperative, with normal speech and good eye contact, appropriate affect, logical flow of thought, and no apparent suicidal or homicidal ideation.  (Tr. 396).  Plaintiff's mood was found to be depressed, and her insight and judgment were found to be fair.  (Id.).  Dr. Lake's impression was bipolar disorder, depressed episode; rule out posttraumatic stress disorder;[17] and rule out personality disorder.  (Id.).  Dr. Lake assessed a GAF of 45 upon admission and 55 upon discharge.  (Id.).  Dr. Lake noted that plaintiff felt that overall she was doing well.  (Id.).  He stated that he felt that her suicide risk assessment was low at that time.  (Id.).  Dr. Lake found that plaintiff had improved, although she continued to experience difficulties with anhedonia,

_____

[17]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience.  See Stedman's at 570.

- 14 -

depression and lack of energy.  (Id.).  He prescribed Wellbutrin[18] and Ambien[19] and discharged her with instructions to follow-up closely with her case worker, Dr. Zia, and her counselor.  (Id.).

Plaintiff saw Bernard J. Dirnberger, LCSW, on April 11, 2003.  (Tr. 392-94).  Plaintiff denied any intent to harm herself or act on any of her suicidal thoughts.  (Tr. 3940.  Mr. Dirnberger recommended individual and group therapy.  (Id.).

Plaintiff presented to Southeast Missouri Mental Health Center on April 22, 2003, indicating that she was thinking of taking a drug overdose.  (Tr. 505).  Plaintiff cried during her interview and expressed feeling helpless and hopeless.  (Tr. 506).  Plaintiff was admitted and was diagnosed by Dr. Kendra Patel with major depressive disorder, recurrent; with a GAF of 35.  (Id.).  Plaintiff's medications included: Imitrex,[20] Ultracet,[21] Naproxen,[22] Ambien, Hydrocodone,[23] Trileptal, Zyprexa,[24] Wellbutrin, and Advair.[25]  (Id.).  Plaintiff was treated with medication and therapy.  (Id.).  Plaintiff showed rapid improvement once medication was resumed.  (Tr. 507).  Plaintiff was discharged on April 25, 2003, at which time she stated her mood was "fine."  (Id.).

---

[18]Wellbutrin is an antidepressant indicated for the treatment of depression.  See PDR at 1678-79.

[19]Ambien is indicated for the short-term treatment of insomnia.  See PDR at 2980.

[20]Imitrex is indicated for the acute treatment of migraine headaches.  See PDR at 1551.

[21]Ultracet is indicated for the short-term management of acute pain.  See PDR at 2509.

[22]Naproxen is a non-steroidal anti-inflammatory drug indicated for the treatment of osteoarthritis.  See PDR at 2891-92.

[23]Hydrocodone is indicated for the relief of moderate to moderately severe pain.  See PDR at 3227.

[24]Zyprexa is indicated for the treatment of schizophrenia.  See PDR at 1877.

[25]Advair is indicated for the treatment of asthma.  See PDR at 1435.

Upon discharge, M. Asif Qaisrani, M.D. diagnosed plaintiff with major depressive disorder, recurrent, without psychotic features; and assessed a GAF of 50. (Id.). Dr. Qaisrani prescribed Wellbutrin and Ambien. (Id.). He stated that if plaintiff becomes noncompliant with her medications, she may deteriorate rapidly with psychiatric decompensation and readmission. (Id.).

Plaintiff saw Lyn Fortner, CSW, at Bootheel Counseling Services on June 10, 2003. (Tr. 575). Plaintiff reported going to church regularly and visiting with family and friends. (Id.). On June 26, 2003, plaintiff reported that she had gone camping and fishing a few times in the past couple of weeks. (Tr. 574). On July 10, 2003, July 21, 2003, and Jul 31, 2003, plaintiff reported financial difficulties. (Tr. 571-73). On August 2, 2003, plaintiff complained of an increase in depression due to the recent breakup with her boyfriend. (Tr. 570). Ms. Fortner encouraged plaintiff to stay active, attend church, and spend time with family and friends. (Id.).

James Spence, Ph.D. completed a Mental Residual Functional Capacity Assessment on June 11, 2003. (Tr. 511-13). Dr. Spence found that plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id.). Dr. Spence also completed a Psychiatric Review Technique, in which he found that plaintiff's major depression caused moderate restrictions of plaintiff's activities of daily

living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation. (Tr. 515-25).

On August 12, 2003, plaintiff underwent a Psychosocial/Clinical Assessment at Bootheel Counseling Services. (Tr. 563-66). Jana Paddock, MRC, LPC, diagnosed plaintiff with major depressive disorder, recurrent, severe, without psychotic features; social phobia; bipolar disorder; and assessed a GAF of 48. (Tr. 566). Ms. Paddock recommended that plaintiff continue with counseling services for the next year to address the following goals: medication services, to build coping skills, to address activities of daily living, to pursue disability benefits, and to increase her socialization. (Id.).

On August 20, 2003, plaintiff saw Ms. Fortner, at which time she reported continued relationship and financial problems. (Tr. 562). On September 2, 2003, plaintiff reported continued depression. (Tr. 560). On September 9, 2003, and September 18, 2003, plaintiff reported an increase in her depression due to the breakup with her boyfriend. (Tr. 557, 559). On September 24, 2003, October 9, 2003, October 13, 2003, and October 27, 2003, plaintiff reported no increase in her symptoms or side effects. (Tr. 555, 554, 552, 551).

Plaintiff saw Kay F. Hunter, LCSW, at Bootheel Counseling Center, for an evaluation on October 6, 2003. (Tr. 529). Ms. Hunter described plaintiff as apathetic, dull, quiet, colorless, vague, aloof, and introverted. (Id.). Ms. Hunter stated that plaintiff has a dependent personality and tends to lean on other people for security, support, guidance, and direction. (Tr. 530). Ms. Hunter indicated that plaintiff reported many symptoms associated with anxiety, including restlessness, edginess, insomnia, nausea, and cold sweats. (Id.). She stated that plaintiff also reported many problems associated with dysthymia, including apathy, social withdrawal, guilt,

pessimism, low self-esteem, feelings of inadequacy and worthlessness, self-doubts, and a diminished sense of pleasure. (Id.). Ms. Hunter stated that plaintiff likely suffers from either major depression or dysthymic disorder. (Id.). She indicated that plaintiff reports some mild cognitive dysfunction but not severe enough to impair functioning. (Id.).

Plaintiff presented to River City Health Clinic on October 29, 2003, with complaints of low back pain and right hip pain. (Tr. 581). Plaintiff underwent a bone scan, which was normal. (Id.). An MRI revealed some bulging discs at L4-L5 and L5-S1 with no impingement on the nerve roots. (Id.). The assessment of Angela Fisher, PA, was chronic low back pain, bulging discs, and NIDDM.[26] (Id.).

Plaintiff saw Ms. Fortner on November 3, 2003, at which time she reported continued depression. (Tr. 550).

The record reveals that plaintiff attended physical therapy for her lower back pain in November 2003 at St. Francis Medical Center. (Tr. 626-30).

Plaintiff saw Ms. Hunter on November 6, 2003, at which time plaintiff was "really down." (Tr. 622). Plaintiff reported that she was placed on a new pain medication that made her drowsy. (Id.). Plaintiff indicated that she was baby-sitting the children of a male friend, who had been paying her bills but stopped. (Id.). Ms. Hunter talked to plaintiff about being alone and having the self-esteem to take care of herself. (Id.).

Plaintiff saw Ms. Fortner on November 11, 2003, at which time she complained of no increase in symptoms or side effects. (Tr. 548).

_____

[26]Non-insulin-dependent diabetes mellitus is a condition characterized by high blood glucose levels caused by either a lack of insulin or the body's inability to use insulin efficiently. See Stedman's at 530.

On November 13, 2003, Ms. Hunter indicated that plaintiff presented "with the same half asleep look on her face as she has all the time." (Tr. 621). Plaintiff was upset because a doctor suggested to her to get a part-time job. (Id.). Ms. Hunter stated that plaintiff is so negative and assumes that she cannot do anything and that she cannot be around people. (Id.). Ms. Hunter stated that she suggested to plaintiff that she seek employment and get control of her life. (Id.).

On November 20, 2003, plaintiff reported spending time working on craft projects and indicated that she would like to go on a two-week trip. (Tr. 547). Ms. Fortner encouraged plaintiff to have her medications refilled. (Id.). On December 10, 2003, plaintiff reported that she had traveled with a friend and enjoyed her trip. (Tr. 546).

Plaintiff presented to River City Health Clinic on December 11, 2003, with complaints of back pain. (Tr. 579). Plaintiff was diagnosed with paravertebral muscle spasm and probable facet disease. (Id.).

Plaintiff saw Ms. Hunter on December 15, 2003, at which time she reported that she had traveled to New York and Canada with a friend and "thoroughly enjoyed it." (Tr. 620).

On December 18, 2003, plaintiff complained of difficulty sleeping. (Tr. 545). Ms. Fortner encouraged plaintiff to report this problem to Dr. Zia. (Id.).

On December 22, 2003, Ms. Hunter indicated that plaintiff's depression was not any better. (Tr. 619). Plaintiff discussed the depression she was experiencing as a result of separating from her husband. (Id.).

Plaintiff presented to River City Health Clinic on January 20, 2004, with complaints of low back pain. (Tr. 577). Plaintiff was diagnosed with low back pain probably associated with degenerative osteoarthritis, continued hip pain, and possible SI joint dysfunction. (Id.).

On January 27, 2004, plaintiff saw Ms. Fortner at Bootheel Counseling Services. (Tr. 618). Ms. Fortner found that plaintiff's mood was normal and plaintiff was calm and cooperative. (Id.). Plaintiff reported that she was attending medical appointments, taking her medications as prescribed, spending time with her family and friends, and attending church regularly. (Id.). On February 2, 2004, Ms. Fortner found that plaintiff's mood was normal and plaintiff was cooperative. (Tr. 617). Plaintiff did not complain of an increase in symptoms or side effects. (Id.). On February 9, 2004, and February 16, 2004, plaintiff reported regular church attendance and spending time with family and friends. (Tr. 616, 614).

On February 23, 2004, plaintiff reported attending church regularly and visiting with family, although she complained of loneliness and problems with old friends. (Tr. 613). Ms. Fortner encouraged plaintiff to be assertive with friends. (Id.). On March 4, 2004, plaintiff reported attending church regularly and going to the movies the previous night. (Tr. 612). Plaintiff indicated that her depressive symptoms were not as bad that week. (Id.). On March 8, 2004, plaintiff appeared very depressed and anxious. (Tr. 611). Plaintiff reported increased crying spells and a marked increase in anxiety. (Id.).

Plaintiff was admitted to Southeast Missouri Hospital on March 10, 2004, after complaining of increased depression. (Tr. 598). Dr. Lake diagnosed plaintiff with bipolar disorder, depressed episode; and personality disorder; and assessed a GAF of 45. (Tr. 599). Dr. Lake found that plaintiff did not appear all that depressed and that her complaints were in excess of her appearance. (Id.). Dr. Lake stated that plaintiff was somewhat overly dramatic and that her appearance was suggestive of an underlying personality disorder. (Id.). Plaintiff was placed

on Topamax,[27] which seemed to help. (Tr. 597). Plaintiff was discharged on March 12, 2004, at which time she was found to be cheerful. (Id.). Prozac,[28] Topamax, and Klonopin[29] were prescribed. (Id.).

Plaintiff saw Bernard J. Dirnberger, LCSW on March 12, 2004. (Tr. 594-96). Mr. Dirnberger recommended individual and group therapy to help plaintiff find ways to cope. (Tr. 596).

Plaintiff saw Ms. Fortner on March 16, 2004, at which time she complained of continued depression. (Tr. 608). On March 24, 2004, and April 2, 2004, plaintiff reported having good days and bad days. (Tr. 607, 606). Plaintiff indicated that she continued to attend church regularly and spend time with family and friends. (Id.). Plaintiff reported no increase in symptoms or side effects on April 8, 2004. (Tr. 604).

On April 13, 2004, plaintiff reported that she continues to attend church regularly and visit with family and friends for short periods of time. (Tr. 603). Plaintiff stated that she could only stand to be around family and friends for "a little bit at a time." (Id.).

In a letter dated June 2, 2004, Ms. Hunter stated that plaintiff complains of being unable to participate in activities because she becomes nervous and frightened in large crowds, and even has trouble being in a crowded environment with her own family. (Tr. 631). Ms. Hunter stated that these symptoms were present when plaintiff was living with her husband and the panic

---

[27]Topamax is indicated for the treatment of seizures. See PDR at 2503.

[28]Prozac is an antidepressant indicated for the treatment of depression. See PDR at 1232-33.

[29]Klonopin is indicated for the treatment of panic disorder. See PDR at 2906.

disorder started after they separated.  (Id.).  Ms. Hunter indicated that testing revealed that

plaintiff has a dependent personality and that this may lead to her current problems since she is

living alone.  (Id.).  Ms. Hunter stated that she has encouraged plaintiff to leave the house on a

daily basis to get used to being outside of the her apartment.  (Id.).  Ms. Hunter stated that

plaintiff's fears are caused by the fact that she has isolated herself and now feels uncomfortable in

public.  (Id.).  Ms. Hunter stated that although plaintiff's symptoms are significant, she believes

that it would be in her best interest to find a job that suits her.  (Id.).  Ms. Hunter expressed the

opinion that plaintiff is not totally and permanently disabled.  (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the nondisability requirements for a period of disability and
      Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act
      and is insured for benefits through March 31, 2004.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset
      of disability.

3.    The claimant's residuals of a lumbar discectomy, chronic obstructive pulmonary
      disease and depression are considered "severe" based on the requirements in the
      Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.    These medically determinable impairments do not meet or medically equal one of
      the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding her limitations are not
      totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the residual functional capacity to perform light work with a
      limitation to occasional climbing, balancing, stooping, kneeling, crouching and
      crawling activities and mild-to-moderate restrictions in understanding and
      remembering simple tasks, sustaining concentration and persistence, socially
      interacting with the general public and adapting to workplace changes.

7.    The claimant's past relevant work as housekeeper and cashier did not require the

performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.    The claimant's medically determinable residuals of a lumbar discectomy, chronic obstructive pulmonary disease and depression do not prevent the claimant from performing her past relevant work.

9.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(Tr. 18L-18M).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on March 27, 2003, the claimant is not entitled to a period of disability, Disability Insurance Benefits, and not eligible for Supplemental Security Income payments under Sections 216(I), 223, 1602, and 1614(a)(3)(A) respectively, of the Social Security Act.

(Tr. 18M).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.**      **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (i) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age,

education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure

must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff raises three claims on appeal from the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in discrediting the credibility of her subjective complaints of pain and limitation.  Plaintiff next argues that the ALJ erred in formulating her residual functional capacity. Plaintiff finally contends that the hypothetical posed to the vocational expert was erroneous.  The undersigned will discuss plaintiff's claims in turn.

## 1.    Credibility Analysis

Plaintiff contends that the ALJ erred in assessing the credibility of her subjective complaints.  Defendant argues that the ALJ properly applied the Polaski factors and found plaintiff's subjective complaints to be not entirely credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies,

and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. The primary question is not whether plaintiff suffers from the impairments alleged; it is whether plaintiff is fully credible when she claims that the symptoms prevent her from engaging in her prior work. See Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of limitations to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ cited the relevant Polaski factors. (Tr. 18K). The ALJ then pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling impairments. The ALJ first discussed the medical evidence. The ALJ provided a thorough discussion of all of the objective medical evidence. (Tr. 18C-18K). The ALJ then found that the medical evidence regarding plaintiff's physical and mental impairments does not support plaintiff's allegations of disability. (Tr. 18I, 18K). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

With regard to plaintiff's physical impairments, the ALJ noted that plaintiff's back pain is non-radicular and results in no neurological abnormalities. (Tr. 18I). An x-ray of plaintiff's lumbar spine taken on April 28, 2002, revealed osteoarthritis of the lower lumbar spine with minimal joint space narrowing of L5-S1. (Tr. 317). The ALJ stated that plaintiff was treated conservatively, mainly with medication, for her back impairment. (Tr. 18C). The ALJ noted that plaintiff does not require a cane, crutch, or other assistive device despite her complaint of an inability to be on her feet. (Tr. 18K). The ALJ also pointed out that Dr. Moyers found plaintiff's effort to be "questionable" in strength testing. (Tr. 18K, 366). Plaintiff does not appear to dispute the ALJ's findings with regard to her physical impairments.

With regard to plaintiff's mental impairments, the ALJ stated that in July 2002, Dr. Lee diagnosed plaintiff with generalized anxiety disorder, panic disorder with agoraphobia, and dysthymic disorder, with a GAF of 60 and found that plaintiff was able to understand and remember moderately complex to complex instructions, concentrate and persist on simple to moderately complex tasks, interact in limited contact situations involving the general public and interact in moderate contact situations with coworkers and supervisors. (Tr. 18I, 443-48). Plaintiff's mental status examination was within normal limits with no significant cognitive difficulties. (Id.). Further, Dr. Lee noted that "there may be some secondary gain issues, causing the claimant to believe she is more impaired than she really is, in a cognitive sense." (Tr. 444). The ALJ also pointed out that plaintiff's treating therapist, Ms. Hunter, expressed the opinion that finding a suitable job would be in plaintiff's best interest. (Tr. 18J, 631). In fact, none of plaintiff's treating physicians expressed the opinion that plaintiff was unable to work due to her impairments.

The ALJ next discussed plaintiff's testimony regarding her daily activities. The ALJ noted that plaintiff presented herself at the hearing as extremely limited. (Tr. 18K). The ALJ then pointed out inconsistencies in the record. The ALJ first noted that in June 2002, plaintiff reported to Dr. Khattak that she has a car and valid driver's license, shares in the household management and chores, and enjoys reading. (Tr. 18K, 431). The ALJ next pointed out that when seen by Dr. Lee in July 2002, plaintiff admitted that since her 2000 alleged onset of disability, she has gone back to college, earning two computer-related certificates, and that she requires only moderate assistance in raising her children. (Tr. 18K, 445). The ALJ further noted that between June 2003 and May 2004, plaintiff reported to the providers at Bootheel Counseling that she goes to church regularly, visits family and friends regularly, had gone camping and fishing a few times, works on craft projects, found and broke up with a boyfriend, traveled to New York and Canada by truck, helped a neighbor with chores such as the laundry, and babysat the children of a friend for income. (Tr. 18K). In addition, plaintiff testified at the hearing that she was independent in her self-care activities, did the usual housekeeping activities, and went shopping with her friend. (Tr. 664-65). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033,

1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating her residual functional capacity. Specifically, plaintiff contends that her GAF scores reveal that she suffers from a serious mental impairment. Defendant argues that the residual functional capacity formulated by the ALJ is supported by substantial evidence.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

After assessing plaintiff's credibility, the ALJ found that plaintiff had the physical residual functional capacity to perform light work with a limitation to occasional climbing, balancing, stooping, kneeling, crouching and crawling. (Tr. 18I). Plaintiff does not appear to dispute this

finding.

The ALJ concluded as follows with regard to plaintiff's mental residual functional

capacity:

> [t]hus, I find that the claimant's depression is mainly situational due to her
> relational problems and results in mild-to-moderate restrictions in understanding
> and remembering simple tasks, sustaining concentration and persistence, socially
> interacting with the general public and adapting to workplace changes. This
> causes mild-to-moderate difficulties in maintaining social functioning and
> concentration, persistence or pace and one or two episodes of decompensation.

(Tr. 18K).

Plaintiff argues that the mental residual functional capacity assessed by the ALJ was

erroneous, as plaintiff suffers from a serious mental impairment. As support for this claim,

plaintiff cites the GAF scores assessed by Drs. Khattak, Zia, Clark, and Patel. Plaintiff also points

out that she has had at least three documented overdoses requiring hospitalization.

The ALJ discussed both the GAF scores assessed by the various consulting and treating

physicians and plaintiff's psychiatric hospitalizations. The ALJ pointed out inconsistencies

between low GAF scores assessed and other evidence in the record. In analyzing medical

evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and

examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley

v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should

be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999)

(quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the

axiom that "[the opinion of a consulting physician who examines claimant once or not at all does

not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)

(quoting Kelley, 133 F.3d at 589). Further, a treating physician's opinion will typically be given

controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). However, such opinions do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148. Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).

The ALJ noted that although Dr. Khattak assessed a GAF score of 48 in June 2002, this score is inconsistent with plaintiff's complaint of "moderate" depression and with Dr. Khattak's findings of an unremarkable exam with normal behavior and flow of thought, intact memory, and average intellect. (Tr. 18I, 431). The ALJ pointed out that in January 2003, Dr. Clark of Bootheel Counseling Center diagnosed plaintiff with moderate bipolar I disorder, with a GAF score of 38, which was a significant deterioration from that rated by Dr. Khatak. (Tr. 18I, 427). The ALJ found that the GAF score of 38 was inconsistent with the rating of plaintiff's affective disorder as "moderate" as well as the mental status examination that found plaintiff alert and fully oriented with no obvious abnormalities, normal speech, average intellect and fund of knowledge logical associations and adequate insight and judgment. (Tr. 18J, 427). The ALJ next stated that

in August 2003, Dr. Zia diagnosed plaintiff with severe major depression, a social phobia, and bipolar disorder with a GAF of 48. (Tr. 18J, 566). The ALJ found that Dr. Zia's diagnosis was based in great part on plaintiff's self-serving comments and is inconsistent with the activities reported in the treating records, which reveal a great level of activities of daily living and no increase in symptoms or side effects. (Id.). Finally, although Dr. Patel assessed a GAF of 35 upon admission to Southeast Missouri Mental Health Center on April 22, 2003, plaintiff was assessed a GAF of 50 upon discharge. (Tr. 506-07).

The ALJ also discussed other medical evidence supporting the finding that plaintiff was less limited than her GAF scores suggest. (Tr. 18J). For example, in October 2001, Dr. Moyers found that plaintiff was mildly depressed with a flat affect, but seemed oriented and had reasonable insight, intact judgment, good recent and remote memory and no abnormalities in thought process. (Tr. 366). Dr. Moyers reported that plaintiff scored a 30 out of 30 on her mini mental status exam. (Id.). The ALJ noted that in October 2001, the state agency psychologist found that plaintiff's depression was non-severe. (Tr. 377-90). The ALJ also pointed out that in July 2002, January 2003, and July 2003, state agency psychologists found that plaintiff had severe dysthymia and panic disorders causing moderate restriction of activities of daily living and moderate difficulties in maintaining concentration and social functioning and one or two repeated episodes of decompensation. (Tr. 18J, 450-64, 476-91, 511-25). Finally, the ALJ noted that plaintiff's treating therapist, Ms. Hunter, found that although plaintiff's symptoms are significant, finding a suitable job would be in her best interest. (Tr. 18J, 631).

The undersigned finds that the mental residual functional capacity assessed by the ALJ is supported by substantial evidence in the record. Although the medical evidence reveals that

plaintiff clearly suffers from a severe mental impairment, there is conflicting evidence regarding the work-related limitations plaintiff's impairment produces. The ALJ considered all of the evidence and attempted to resolve the inconsistencies in the record according to the applicable standards. The ALJ discussed plaintiff's psychiatric hospitalizations. At plaintiff's most recent hospitalization in March 2004, it was noted that plaintiff did not appear all that depressed and that her complaints were in excess of her appearance. (Tr. 599). Upon discharge, plaintiff was found to be cheerful. (Tr. 597).

As plaintiff points out, some physicians assigned low GAF scores. None of these physicians, however, provided work-related limitations or expressed the opinion that plaintiff was disabled. Ms. Hunter, plaintiff's treating therapist, expressed the opinion that although plaintiff's symptoms were significant, it was in her best interest to find a job. Ms. Hunter, a mental health professional, had been seeing plaintiff regularly since October 2003. An ALJ has the authority to afford greater weight to medical evidence and testimony than to a GAF score when the evidence so requires. See Hudson v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003). In fact, as defendant points out, the Commissioner has declined to endorse the GAF scale to evaluate Social Security claims. See 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000). As such, the ALJ did not err in assigning greater weight to the medical evidence and testimony in this case than to the various GAF scores assigned to plaintiff.

After properly assessing plaintiff's credibility, the ALJ formulated a mental residual functional capacity supported by the record as a whole. The mental residual functional capacity is consistent with all of the mental health professionals who expressed an opinion on plaintiff's work-related limitations. All of the state agency psychologists found that plaintiff had mild to

moderate work-related mental restrictions, which is consistent with the ALJ's mental residual functional capacity. Significantly, the mental residual functional capacity is consistent with the finding of plaintiff's treating therapist, Ms. Hunter, that although plaintiff's symptoms were significant, it was in her best interest to find a job. Further, plaintiff's testimony regarding her daily activities supports the ALJ's determination that her mental impairment produces moderate work-related limitations but is not disabling. Thus, substantial evidence supports the mental residual functional capacity formulated by the ALJ.

### 3.    Vocational Expert Testimony

Plaintiff argues that the ALJ erred by improperly relying on vocational expert testimony. Specifically, plaintiff argues that the hypothetical question posed to the vocational expert was erroneous because it did not consider the combination of plaintiff's physical and mental impairments. Defendant contends that the ALJ properly posed a hypothetical question to the vocational expert based on all of plaintiff's limitations he found supported by the record.

Testimony from a vocational expert based on a properly phrased hypothetical question constitutes substantial evidence upon which to base an award or denial of Social Security benefits. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001). "A hypothetical question posed to [a] vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). It must "capture the concrete consequences of the claimant's deficiencies." Id. (citing Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997)).

Here, the hypothetical question presented to the vocational expert contained the same limitations as the ALJ's residual functional capacity assessment. (Tr. 672). The vocational expert

testified that such an individual would be able to perform plaintiff's past work as a housekeeper and a cashier. (Id.). The vocational expert further testified that the individual could perform other entry-level, unskilled work. (Tr. 673).

The undersigned has found that the residual functional capacity formulated by the ALJ is supported by substantial evidence. The ALJ took into consideration plaintiff's physical and mental impairments in restricting plaintiff to light work with a limitation to occasional climbing, balancing, stooping, kneeling, crouching and crawling; and mild-to-moderate restrictions in understanding and remembering simple tasks, sustaining concentration and persistence, socially interacting with the general public and adapting to workplace changes. (Tr. 18I, 18K). The hypothetical question posed to the vocational expert was based upon this residual functional capacity. The ALJ properly used vocational expert testimony to determine that plaintiff could perform her past work as a housekeeper and cashier, along with other work existing in significant numbers in the economy.

**<u>Conclusion</u>**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.


Dated this  29th  day of September 2008.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE